UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENREID C. FOSTER,<br><br>    Petitioner,<br><br>  v.<br><br>MATTHEW CATE,<br><br>    Respondent.               / | No. C 12-0088 JSW (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND CERTIFICATE OF APPEALABILITY** |

## INTRODUCTION

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The Court ordered Respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support, and has lodged exhibits with the court. Petitioner responded with a traverse. For the reasons set out below, the petition is DENIED.

## BACKGROUND

**I.    Procedural Background**

On August 15, 2007, a jury convicted Petitioner on two counts of aggravated sexual assault on a child (Cal. Penal Code § 269) and three counts of forcible lewd acts with a minor (Cal. Penal Code § 288(b)(1)). Petitioner was sentenced to a term of forty-eight years to life in prison.

The California Court of Appeal affirmed the judgment on July 28, 2009, (Ex. E)[1], and the California Supreme Court denied a petition for review on October 14, 2009. (Ex. G.) Petitioner's state habeas petition was also denied by the Superior Court, the Court of Appeal and the California Supreme Court. Petitioner subsequently filed his federal petition for writ of habeas corpus on January 5, 2012.

## II. Factual Background

The Court of Appeal summarized the facts of the case as follows:

> T. lived with defendant, who is her father, and with defendant's wife, who is her mother. At the time of trial, T. was 14 years old.
>
> T. described the circumstances that would lead to discipline by defendant when she was growing up. For example, she would get in trouble with defendant if she did not play the piano or practice taekwondo. She would also be disciplined for lying. At times, she lied about whether she had practiced taekwondo or had done her homework. She acknowledged that defendant had punished her a lot for lying.
>
> Discipline by defendant took various forms. He had given T. "timeout[s]," placed her on "restriction," and made her stand in a corner. On one occasion, T. stood in the corner for more than four hours. Defendant also disciplined T. by spanking her with his hand or a belt. She was hit on the buttocks, legs, "maybe" her back, and "[s]ometimes" her face. Defendant had used a leather belt, and T. had been struck by the belt buckle. Defendant used the belt if T. lied or "didn't do something," such as her homework. When T. was in the fourth grade, defendant hit her with the belt because she "wouldn't get the right answer" when she "was doing math." T. was afraid and crying. Her mother was in the house but not in the same room during the incident. T. did not say anything to her mother about it.
>
> When T. was nine years old and in the fourth grade, she went to school with injuries to her face. After a teacher spoke with T., the police were called. T. was "[s]cared of what might happen" if she disclosed what had occurred because defendant had warned that "he would halfway kill" her if she told anyone. T. told San Jose Police Officer Curtis Reeves that defendant had injured her the previous night and had threatened to kill her, and that she was afraid to go home. She also reported that her mother had told defendant not to hit her, and that her parents always argued whenever her mother said this to defendant. Officer Reeves observed redness below T.'s right eye and below her left temple. T. was sent to a shelter and then lived at a foster home for several months. She missed living with her mother during this period of time. T. resumed living with her parents when she was in the fifth grade.

---

[1] Citations to "Ex." are to the record lodged with the Court by the Attorney General, except where otherwise noted.

2

. . . .

At trial, T. admitted taking one of her mother's checks without permission. T. filled out the check for $30 to her middle school to cover the proceeds for a candy fundraiser but left the signature line blank. She later told her mother that she would get detention if the school did not receive payment, so her mother gave her money.

T. initially denied at trial that she had used her parents' credit cards to make online purchases without their permission. She later admitted to using her mother's credit card without her knowledge to purchase internet time. She also admitted that she had lied at the preliminary hearing when she denied taking any credit cards and denied making purchases without permission.

T. had sex education in the sixth and seventh grades.

Defendant began touching T. inappropriately in 2006. T. initially told the police and testified at the preliminary hearing that it began in June when she was 13 years old, but she later testified at trial that it started in March when she was 12 years old.

The first time that it occurred was at night. T. was on the floor watching television and defendant was lying on the couch. T.'s mother was in her bedroom. Defendant asked T. to get on the couch, and she complied. It was not unusual for them to watch television together on the couch. On this occasion, while she was lying on the couch and watching television, defendant lay behind her with the front of his body against her back. T. was wearing a long t-shirt and pajama pants. Defendant draped his arm over her body and used his hand to touch her vagina over her clothing. T. asked him "what he was doing." He said "[n]othing" and moved his hand. T. got up and went to sleep with her mother in her mother's bed.

Defendant touched T.'s vagina over her clothing with his hand more than once. T. indicated that when the touching occurred, defendant's hand "moved" as opposed to "stay[ing] in one place." The touching always occurred in the family room.

Defendant also used his hand to touch T.'s vaginal area on her skin more than once. Each time, T. was afraid. When she tried to pull his hand away, he sometimes would stop touching her. Other times, he pushed her hand away. T. told him to "'stop'" more than one time, but he did not always comply. Defendant also put his finger inside T.'s vagina more than one time.

Defendant warned T. that if she told anyone about the touching, he would go to jail and she would go to the shelter. T. did not want to go to a shelter again, but she also did not want her father to touch her. Defendant told T. that it was not going to happen anymore, but the touching continued and T. was afraid that it might happen at any time.

T. thought about telling someone the very first time that defendant touched her, but she did not. She did not tell her mother because she was afraid her mother would tell defendant and T. would "get in trouble." She also thought her mother would not believe her and would get mad at her. Further, she thought it would "hurt" her family, they would "be broken," and her father could lose his

3

job. T. admitted that at the preliminary hearing, she also gave the following reasons for not telling her mother: T. did not want to be poor, she knew that defendant would go to jail and lose his job, her mother would have only one income and would be struggling because they had just bought a house, and T. would go into foster care or a shelter.

The last period of time during which defendant touched T. was in September 2006, when T. was 13 years old. On more than one day, while T.'s mother was in Philadelphia for a few days, defendant touched T.'s vagina area with his hand. On the very last occasion, defendant called T. into the family room, where he was sitting on the couch. Defendant removed all of his clothes and those covering the bottom part of T's body. T. was afraid. Defendant lay on the couch with T., rubbed her vagina, and put his finger in her vagina. T. tried to move his hand but was not able to overcome his strength. Defendant tried to take T.'s shirt off, but she "held it down." He touched her butt with his penis. He also asked her to touch his penis. When she did not comply, he used his hand to make her touch it. T. was able to pull her hand away after a "[s]hort time." T. saw defendant move his own hand on his penis, and a white substance came out and onto the couch. Defendant used a blanket to wipe it up.

Before T. went to school the next day, defendant yelled at her for not doing her taekwondo stretches and regarding her chores. It was not unusual for T. to get in trouble for these things. At school, T. told a teacher that she wanted to speak with her. T. stated: "The last time I said something to someone I ended up in foster care." T. stopped talking at that point, and the teacher took her to the vice principal's office. T. was embarrassed to disclose any details and indicated that she preferred to communicate in writing. After being given paper, T. wrote that she had been touched in places that she knew were not "appropriate," the last time it happened was "last night," it "usually happens" when her mother is not at home, and it "occurs about every 2 to 3 days." T. also indicated in writing that she had been touched on her vaginal area. After reading what T. had written, the vice principal instructed T.'s teacher to call child protective services. T. talked to a police officer and was eventually taken to a shelter.

T. had approached her teacher because she trusted her and was angry at defendant. At trial, T. denied that she had made up what happened because she was mad at defendant, or so that defendant would not live with her and discipline her anymore.

On September 27, 2006, the day after being taken to a shelter, T. was interviewed by San Jose Police Officer Matty Hrncir. T. was talkative while Officer Hrncir was building a rapport with her. Once they started discussing why T. was there, T. "closed down," her body "basically slumped down," she was "very sad," and she later started crying. T. described the first and last incidents involving defendant. T. indicated that the first incident occurred approximately two to three months prior to the interview. She reported that she had "'kept telling him to stop.'" She eventually "'jumped off the couch and went on to the floor.'" Defendant told her to get back on the couch, but T. went to her mother. Regarding what was happening to her, T. told Officer Hrncir: "'I wanted to tell someone a long time ago, but then I couldn't.'"

Sometime after the interview with T., Officer Hrncir called T.'s mother to

4

advise her that T. was in protective custody and that defendant was going to be arrested. T.'s mother did not ask Officer Hrncir what T. had to say or what evidence the police had against defendant. T.'s mother wanted to talk to defendant, so Officer Hrncir arranged a telephone call between defendant, who was in an interview room, and T.'s mother. Officer Hrncir informed defendant that the call would be recorded. During the call, T.'s mother asked defendant whether "[i]t is true." He responded, "[n]o." She asked, "why is this happening again, what's going on this thing[?]" Defendant replied that he could not tell her a "whole lot about it" at the moment. Defendant told her to complete her work assignment, not to "jeopardize" her job, and that he thought he would be "losing everything, [his] job." He also stated to her: "I guess that's gonna the uh, end of it, end of us, so I would kind of like to talk to you." T.'s mother told defendant that she loved "both" of them and she did not want "something happening to" defendant and T.

Officer Hrncir never formally interviewed T.'s mother.

. . . .

The Defense Case

. . . .

T.'s mother testified that she had been married to defendant for nearly 16 years by the time of trial in 2007. T. was removed from her mother's care in September 2006, while her mother was on a business trip. Since that time, T.'s mother has been involved in a juvenile court proceeding regarding placement for T., who is currently living in a foster home.

. . . .

T.'s mother stated that defendant is a "loving father" who is "concerned especially" about T.'s education. In characterizing him as a "strict disciplinarian," T.'s mother explained that defendant always wanted T. to do her homework as soon as she came home from school and wanted to make sure the work was completed. If T. did not finish her homework, defendant would "put her in the corner" and not let her "go out and play." Defendant would also put her in the corner and restrict her activities if she lied, because lying "really upset" defendant. When defendant learned that T. had lied about completing her homework, he got mad at T. and at T.'s mother for "not helping [him] get[ ][T.] straight." T.'s mother would "cover[ ] up" for T. by telling defendant that she had completed all her homework because T.'s mother thought defendant was "hard" on T.

. . . .

T.'s mother believed that T. had "a problem telling the truth at home" beginning in 2005 or 2006. She and defendant considered sending T to a psychiatrist because of her "lying habit." For example, T. lied about completing her homework and her chores. T. also denied knowing anything about her mother's missing credit card. Later, however, T.'s mother found the card in T.'s karate bag and unauthorized charges on the card. T. had also indicated to her parents that she wanted to be in a band, that practice would "be coming," and that her parents would need to sign some paperwork. A month

5

later, when asked "what happened to the band," T. responded, "I don't know." T.'s mother believed that T. had lied about being in a band. T.'s mother also believed that T. lied about stealing her checks. When she questioned T. about a missing check and told T. that markings in her checkbook suggested that someone was trying to copy her signature, T. denied accessing the checkbook. T.'s mother later found the missing check in T.'s backpack. The check had T.'s handwriting on it but was not signed. T. also told her mother that she had lost, or someone had taken, the money that her mother had given her for a school fundraiser and that she was being sent to detention. She asked her mother for a check to pay the school, and her mother gave her one for $30.

When T.'s mother visited T. after T. was removed from her care in 2006, T. stated that she would not visit her mother if she failed to turn on the media bundle for T.'s cell phone.

In 2006, T.'s mother and defendant had sex approximately four to six times a week. It usually took place in the bedroom, but "probably" once a month they had sex in the family room.

In late September 2006, T.'s mother went on a two-week business trip to Philadelphia. T.'s mother testified that on the night before she left, she had sex with defendant on the couch in the family room. Defendant ejaculated on the couch and then used a blanket to clean it. T.'s mother testified that during the following month, when the police were in her house, they informed her that "they were looking for any sperm that might be on the couch."

. . . .

T.'s mother testified that she was not aware of anything inappropriate going on between T. and defendant. She stated that the dependency court and a social worker did not allow her to talk to T. about the substance of T.'s accusations against defendant.

In February 2007, T.'s mother told a defense investigator that there was "'no way'" defendant "'had any kind of sexual contact with [T.]'" However, in May 2007, she told the family court that she believed T. and not defendant. At defendant's trial in August 2007, she indicated that she believed that there had been sexual contact between T. and defendant. She stated that she was supporting T. because she wanted to keep the family together and that was "the most important outcome."

(Ex. E at 2-13;[2] *People v. Foster*, 2009 WL 2244220 (Cal. Ct. App. July 28, 2009) at *1-8 (footnotes omitted))

///

///

---

[2] The opinion of the California Court of Appeal was not published in official reports. California Rules of Court, rule 8.115(a), prohibits courts and parties from citing or relying on opinions not certified for publication, except as specified in rule 8.115(b), as is the case here.

**STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

# ANALYSIS

Petitioner presents seven grounds for habeas relief: (1) that he received ineffective assistance of appellate counsel; (2) that trial counsel was ineffective in failing to conduct a reasonable investigation of the case; (3) that trial counsel was ineffective in failing to move to exclude a pretrial statement by a defense witness; (4) that the prosecutor committed misconduct by making misrepresentations during trial; (5) that the prosecutor committed other forms of misconduct; (6) that the cumulative effect of trial counsel's errors violated his constitutional rights; and (7) that appellate counsel did not present an adequate record on appeal.[3]

## I/VII. Ineffective Assistance of Appellate Counsel

In claims one and seven, Petitioner argues that appellate counsel was ineffective due to his failure to augment the record on appeal by failing to include the transcript from a sentencing hearing. Petitioner argues that the transcript was required to prove his claim on direct appeal that the trial court erred in denying his motion for a new trial.

### A.     Standard

Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984); *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010). First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue. *Smith*, 528 U.S. at 285; *Moormann*, 628 F.3d at 1106. Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. *Smith*, 528 U.S. at 285–86; *Moormann*, 628 F.3d at 1106. It is important to note that appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant. *See*

---

[3] As some of the claims are similar, they will be discussed together.

8

*Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997); *Miller v. Keeney*, 882 F.2d 1428, 1434 n.10 (9th Cir. 1989). The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. *See id.* at 1434. Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason – because he declined to raise a weak issue. *Id.*

### B. Analysis

A sentencing hearing occurred on October 31, 2007. There is no transcript for this hearing, merely a court form indicating the trial court provided a continuance to January 30, 2008, for Petitioner to file a motion for a new trial. (Clerk's Transcript (CT) Vol. 2 at 327.) On January 28, 2008, Petitioner filed a motion for another continuance to obtain further evidence to support the motion for a new trial. Petitioner believed that a social worker in the dependency case had coerced T's mother, Mrs. Foster, into changing her testimony as the mother changed her opinion if she believed T's testimony. Apparently, Mrs. Foster had previously told Petitioner and a defense investigator that she believed Petitioner. (Traverse at 36-37; Reporter's Transcript (RT), Vol. 10 at 2206.) Though, Mrs. Foster never said at a court hearing that she believed Petitioner. Petitioner argued more time was needed to allow the family court to rule on a motion and to interview the social worker. Of course Mrs. Foster testified on behalf of the defense at trial. The trial court denied the motion for a continuance and as there are transcripts from this hearing on January 30, 2008, the trial court noted that a continuance was not needed as the motion for a new trial would be meritless and the trial court explained the reasons. (RT, Vol. 10 at 2203-07.)

On direct appeal, Petitioner argued that the trial court erred in denying the motion for a new trial. The California Court of Appeal denied the claim stating:

> Lastly, the issue of whether *T.'s mother believed* T.'s allegations and whether she had been coerced into falsely testifying about her belief was collateral to the main issue in the case, that is, whether defendant had actually engaged in inappropriate conduct with T.
>
> In sum, T.'s testimony was the strongest evidence introduced against defendant

9

> and defendant's proffered evidence would have only undermined the credibility of one of his own witnesses, T.'s mother, on a collateral point. In view of the record in this case, we believe that the trial court reasonably concluded that defendant's proffered evidence concerning the alleged coercion of T.'s mother was not """"such as to render a different result probable on a retrial"""" of the matter. [Citation.] Accordingly, in the absence of any likelihood that defendant would be successful on a new trial motion based on evidence that T.'s mother had been coerced, we determine that the trial court did not abuse its discretion in denying defendant's motion to continue sentencing to further investigate such evidence and that defendant was not prejudiced thereby.

(Ex. E at 25; *People v. Foster*, 2009 WL 2244220 (Cal. Ct. App. July 28, 2009) at *16)

Petitioner does not raise the issue in this federal petition that the trial court erred in denying the motion for a new trial. Rather, Petitioner argues that appellate counsel was ineffective for failing to include the transcripts from the October 31, 2007, hearing, where a continuance was provided. However, Petitioner does not specifically describe what appeared on the transcript that was so important to render appellate counsel's conduct ineffective. Petitioner merely states that on October 31, 2007, he "alluded to [the] court that he had witness[ed] some of the actual coercive process" against T's mother. (Pet. at 9.) Petitioner fails to describe what he witnessed that would have entitled him to a new trial.

Petitioner raised this claim in a state habeas petition that was denied in a reasoned opinion by the superior court[4] that described how Petitioner failed to connect his arguments with how the alleged ineffective assistance of appellate counsel by not requesting the transcripts led to a less favorable result in his case. (Pet. at 37.) The superior court's decision is not contrary to established supreme court authority. Moreover, "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994). Petitioner's argument that appellate counsel was ineffective for failing to include transcripts without describing why the transcripts are important is insufficient and meritless. Moreover, as noted by the California Court of Appeal on direct appeal, Petitioner's motion for a new trial lacked merit as it involved alleged coercion of a defense witness on a collateral issue and did not involve the

---

[4] The Court of Appeal and California Supreme Court denied the later habeas petitions without reasoned opinions.

10

evidence of the victim that was essential in finding him guilty. This claim is denied.

**II/III. Ineffective Assistance of Trial Counsel**

Petitioner next contends that trial counsel was ineffective for failing to investigate the family court proceedings, the actions of the social worker and Mrs. Foster's change in opinion regarding if she believed T. Petitioner also argues that trial counsel was ineffective for not moving to exclude Mrs. Foster's pretrial statement that she believed T.

### A.   Standard

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must show: first, that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. at 687–88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. *Id*. Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689.

### B.   Analysis

Petitioner states that the social worker criticized Mrs. Foster for visiting Petitioner in jail, aiding in his defense and thought she should divorce him. Petitioner states that later at a family court hearing Mrs. Foster told the family court that she believed T. Petitioner argues that trial counsel should have interviewed Mrs. Foster and the social worker to discover why the social worker was against Mrs. Foster and he should have obtained the transcripts from the family court hearing. Petitioner again fails to set forth what information would had been discovered if trial counsel conducted an investigation and how he was prejudiced. This claim was also denied by the superior court:

> Petitioner claims that his trial counsel was ineffective for failing to adequately investigate his case. Petitioner sets forth a statement of facts relating to a

11

>dependency proceeding and his preliminary examination. Petitioner then claims that trial counsel was ineffective for failing to file a litany of motions. However, petitioner never connects the facts he sets forth with the motions he claims his trial attorney should have filed. More importantly, petitioner does not explain how the filing of these motions would have impacted the outcome in his case. As such, petitioner has not established that he was prejudiced by any alleged failings on the part of his trial counsel.

Pet. at 37.

Petitioner has failed to demonstrate that the state court opinion is an unreasonable application of *Strickland*. In fact, Petitioner has not even attempted to describe any prejudice from counsel not further investigating the family court proceedings. Petitioner simply assumes that a further investigation would have resulted in a different outcome of his trial. This is insufficient to warrant habeas relief. Moreover, Petitioner has failed to offer any evidence, other than his conclusory statement, that Mrs. Foster's testimony was coerced. Petitioner includes a declaration from Mrs. Foster that describes her interactions with the social worker but make no mention that her testimony was coerced or she did not believe T's allegations. (Pet. at 46-47.) While it is clear Petitioner believes that Mrs. Foster's testimony was coerced, he has provided no evidence to support this allegation. Moreover, as described above, Mrs. Foster's testimony that she believed T was a collateral issue to the rest of the evidence presented at trial, namely T's testimony. Assuming arguendo that Petitioner could show that Mrs. Foster did not believe T's testimony, he has still failed to demonstrate how this would have affected the outcome of the trial. The claim is denied.

Petitioner also argues that trial counsel was ineffective for not moving to exclude Mrs. Foster's pretrial statement that she believed T. As discussed above, even if counsel was ineffective, Petitioner has failed to demonstrate prejudice as Mrs. Foster's statement was not a key piece of evidence that would have changed the outcome of the trial. Moreover, Petitioner offers no explanation or theory on why the trial court would have excluded the statement. It is highly doubtful that had trial counsel moved to exclude the statement, the trial court would have granted the motion. Failure to make a futile motion does not constitute ineffective assistance of counsel. *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994).

**IV/V. Prosecutorial Misconduct**

In claim four Petitioner argues that the prosecution misrepresented a material fact by asking Mrs. Foster on cross examination if she said in family court that she believed T. In claim five, Petitioner states that the social worker made inappropriate comments after the trial.

**A.     Standard**

Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). A prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir.) (citation omitted), *cert. denied*, 516 U.S. 1017 (1995).

**B.     Analysis**

In claim four, the alleged misconduct involves the prosecution asking Mrs. Foster on cross examination about a statement she made in family court that she believed T:

> [Prosecution]: In fact, on May 16th of this year, when visiting Judge Stewart asked you in family court, pinned you down and made you answer the question: Who do you believe? What did you say to her?
>
> [Defense Counsel]: Objection. Irrelevant.
>
> The Court: Overruled.
>
> [Mrs. Foster]: I said I believe her.

13

> [Prosecution]: You said, "I believe my daughter and not my husband"; correct?
>
> [Mrs. Foster]: Yeah.
>
> [Prosecution]: That was the truth, wasn't it?
>
> [Mrs. Foster]: Yeah.

(Reporter's Transcript (RT), Vol 7 at 1345.)

Petitioner does not allege that the prosecution misquoted Mrs. Foster or even that Mrs. Foster did not make this statement in family court. Petitioner concedes that Mrs. Foster made this statement. Rather, this claim involves Petitioner's argument that Mrs. Foster was coerced into making this statement by the social worker, therefore it was inappropriate for the prosecution to raise the issue on cross examination. Petitioner also states that this statement was made by Mrs. Foster on May 17, before Judge Tondreau in family court, not on May 16, before Judge Stewart as stated by the prosecution.

As Mrs. Foster did make this statement before a family court judge, there was no misconduct in the prosecution raising the issue. While Petitioner believes the statement was coerced, he has not supplied any evidence to support this contention or any evidence that the prosecution should have known it was coerced and not referred to the statement. To the extent the statement was made the next day before a different judge, any misstatement by the prosecution seems inadvertent and was harmless. This claim was denied by the state court on appeal and Petitioner has failed to demonstrate the denial was unreasonable. (Pet. at 37.) This claim is meritless and Petitioner is not entitled to relief.

With respect to claim five, Petitioner states that shortly after the trial the social worker stated to Mrs. Foster, "your husband intimidated you and your daughter. He cannot intimidate me, he got the wrong person. Anyway he is convicted of all charges." (Pet. at 24.) Later the social worker allegedly told Mrs. Foster that Petitioner's sentencing was continued because of a conspiracy, and then the social worker laughed. (*Id.*) Petitioner also discusses reports from the social worker who describes tension between T and Mrs. Foster because Mrs. Foster visited Petitioner while in jail and supported him at trial and a report

14

where a private therapist stated that Mrs. Foster should believe her daughter if they want to be reunited.

The incidents and reports Petitioner describes all occurred after Petitioner was found guilty at trial. It is also undisputed that what Petitioner describes concerned the social worker and there are no allegations of any connection to the prosecution or trial. Petitioner does not even attempt to connect the social worker's statements and reports to the prosecution nor does he explain how this affected the trial if it occurred afterwards. The state court denied this claim as Petitioner failed to demonstrate how the alleged misconduct led to a less favorable result. The state court's decision was not unreasonable and this claim is denied.

## VI. Cumulative Error

Petitioner's cumulative error argument is also without merit. A cumulative error claim allows for habeas relief when, although no single error independently warrants reversal or rises to the level of a constitutional violation, the effect of multiple errors caused the petitioner to suffer undue prejudice. *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) ("Where ... there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors" in the trial). However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011); *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002). Here, Petitioner has failed to demonstrate even a single constitutional error that had a prejudicial effect. *Id*. Accordingly, his claim of cumulative error is denied.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this Court's denial of his claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Consequently, no certificate of appealability is warranted in this case.

1  The clerk shall enter judgment and close the file.

2  IT IS SO ORDERED.

3  DATED: March 29, 2013

4  _____
JEFFREY S. WHITE
United States District Judge

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

KENREID C. FOSTER,

    Plaintiff,

v.

MATTHEW CATE et al,

    Defendant.

Case Number: CV12-00088 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 29, 2013, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Kenreid C. Foster G10501
CSP - Los Angeles
C3-104L
P.O. Box 4610
Lancaster, CA 93539

Dated: March 29, 2013

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk